Thank you, Your Honors. May it please the Court, my name is Mitch Auslander from the firm of Wilkie Farr and Gallagher, counsel for the appellant Marshall McLennan. First let me thank the Court for arranging all of this technology to make this hearing possible. I fear it was caused by my need to postpone the hearing before, for which I apologize and I apologize to Mr. Passage and Ms. Thayer, but thank you all very, very much. We're happy to accommodate you, and maybe I shouldn't let out the state secret, but Judge Thunheim is participating by telephone from Kosovo. Oh, boy. Special thanks to Judge Thunheim. Thank you, and with the Court's permission, I'd like to reserve two minutes for rebuttal. I'd like to talk this afternoon primarily about the statute of limitations argument that we have raised in the papers, because I think that resolution of that argument, that issue, will resolve this case in its entirety, not requiring a further trial if there is a reversal. The parties agree and have always agreed that the statute of limitations that applies here is two years. And that's true whether it's a contract claim or a tort claim, it's the same thing. That's correct. That's under the Hyde v. Mill case, and I think the parties agreed, and Judge Otero so found at the district court. Where we differ is what triggers the It's Marsh's position, and we think it is supported by every case that has been decided about insurance broker statutes of limitations in California, that the cause of action unquestionably accrues when the insurance company, in this case National Union, sends its denial letter to the insured so that the insured knows that it has a problem with the coverage. There were, before our trial, seven cases by our count that said that, applying California law. One since the trial. How many of those cases are statute of limitations running as a claim against the insurance company rather than the broker? They're broker cases, Your Honor. They're all broker cases. They're broker cases, yes. There was one decided after the trial, but before Judge Otero decided the renewed motion for judgment, and that's called the Schuette case, which was decided by the Ninth Circuit. It's a non-published decision. It's not precedent, but it is a good indication of what California, in our view, what California law has been for a great deal of time. The other side, the appellee's argument has been, if I'm understanding it correctly, that notwithstanding what that law is, that the denial letter that came from the insurance company put them on notice that they had a problem with the coverage, that what really triggers the statute of limitations was when the risk manager, the purchaser of insurance for SEMPRA, testified that he personally believed that there was a claim against Marshall McLennan for malpractice of some sort against the broker when he read a decision by the arbitrators following the denial of coverage by the insurance companies sometime thereafter. And what was the position of the various parties during the arbitration as to whether there was or was not coverage? Well, during the arbitration, SEMPRA took the position, of course, that there was coverage, and the insurance company took the position that there was not coverage. And what position did Marsh take? Marsh didn't have a position because Marsh wasn't in the arbitration. Was there any communication from Marsh to SEMPRA as to the likelihood of success in the arbitration? There was relatively little communication. The appellees, SEMPRA, point to a couple of communications that they call reassurances for purposes of trying to toll the statute of limitations that they say meant that somehow lulled them into a sense of security that they wouldn't have to sue Marshall McLennan. But those communications that they point to are an email from a broker, a Marsh broker in London expressing confidence that they will prevail in the case against arbitration, in the case against the insurance company, a declaration by one of the Marsh brokers which they had asked for and wrote themselves, which dealt with an exclusion not at issue in this case. And they point to a series of conversations that took place way in the past in which they say Marsh didn't tell them that there wasn't coverage for the claim. Those are the communications. Why, excuse me, this is Judge Kennedy, why would it necessarily be inquiry notice that the broker may have misbehaved or been negligent or something when the insurance company is denying coverage but might well turn out to be wrong in denying coverage, in which case I would think that would mean, well, the broker had done his job. Well, the answer, Your Honor, is there are cases, in fact, where it is not clear that the broker had committed some sort of an error, but nonetheless, the fact that the coverage that the broker procured was not in place. And so the court has held the insured to the beginning of the accrual of the cause of action at the time the denial letter came in. However, in this case, we don't even have to worry about that because the denial letter that Semper received specifically pointed to an argument by the insurance company that there was no expropriatory act that gives rise to coverage and that there was a currency devaluation exclusion in the policy that precluded coverage. Both of those are things that Semper is pressing, has pressed Marsh and accused Marsh of getting wrong, not getting us the coverage in the first place. And as far as the currency devaluation is concerned, the panel found that the currency devaluation exclusion in the policy was the cause of Semper's loss. And that is ultimately what is part of what is blamed on Marsh. So the answer to your question, sorry for being inartful about it, is I don't think that the law requires that the insurer's denial goes specifically to something that you could point to as the broker's negligence. But in this case, it did. The Schuette case, for example, that this Court decided after trial did not, the denial letters that came from the insurance company did not specifically point to something that could be construed as the broker's error. They were talking about whether there was, whether the policy, whether under the facts there was a suit that gave rise to a claim under the policy, or whether there was damages within the terms of the insurance policy that could give rise to coverage. Those on their face did not appear to implicate the broker's conduct. So I don't think it matters. But again, in this case, our case I believe is stronger because Semper is claiming that Marsh should have gotten a coverage that covered expropriation, something that destroyed the value of the licenses. And while they don't accuse us of having a currency devaluation exclusion in the policy, the natural consequence of what they claim we did wrong was that the currency valuation, the currency devaluation exclusion bit, and that meant that the panel found that there was no coverage. So I think the, it is almost surprising to me that there is a dispute over whether the initial triggering event is the insurer's denial of coverage, with the cases I think pretty clearly coming down on the side of if there's a denial letter that the insured knows that it doesn't have coverage from the insurer, that the insured is on notice that it might have a claim against the broker. What becomes the interesting question, as opposed to the Semper position, which is on a subjective basis, they did not know they had a claim until they actually read the arbitrator's award and saw something that Mr. Lathers anyway, the risk manager, says, as Mr. Passage explained at the trial, turned on the lightbulb for him. We were not entitled to go into discovery about what else Semper's counsel might have been thinking about whether there was a claim against the broker. There are certainly indications in the record, in the bills that were submitted by Semper's counsel, that they were considering the devaluation exclusion, which ultimately became the problem. That they discussed with their party arbitrator the devaluation exclusion that ultimately became the problem. But that is something that we were never able to learn, because Semper only evidenced at trial, as best I recall, is that Mr. Lathers testified that the first time he pleaded against Marsh was when he read the award. If that's the test, and this is pointed out in some of the cases, it's obviously very easy for an insured OED, always to say, aha, the lightbulb went on when we lost the case against the insurance company. And that enables them to decide, excuse me, how long the statute of limitations they want to have, and also how they want to argue their case to the insurer, to the exclusion of the broker who is not included in the underlying lawsuit, which could change the dynamics. So we have very different views on what actually triggers the statute of limitations, and I think it's one or the other. I don't think that there's any black and white there. It's either when the denial letter came in, and by the way, the denial letter was preceded by a number of earlier indications that the insurance company was having problems with this claim, including the expropriation and including the currency devaluation exclusion, which I think under some of the cases could have led to a trigger of the statute of limitations, but there isn't any question that when the denial letter came in, in January of 05, that that triggered it under the law of California, and the case wasn't brought until two years later. SEMPRA, while we disagree on that point, they move on to suggest that the statute of limitations was either somehow not commenced, excuse me, or told as a result of conduct by Marshall McLennan. As far as whether any conduct by Marshall McLennan, whether told the commencement of the statute of limitations is concerned, they point to a few things. What I mentioned before, a statement of confidence that they'll win by a Marsh broker in London, and the Heidi Melsheimer declaration, which they asked for and received to help them win on, in the arbitration, on an exclusion that that was not at issue, and a declaration that was not admitted to trial. Well, those things could not have told the commencement of the statute of limitations because they all occurred after the January 05 letter from AIB. So it just can't affect the commencement. Then the question becomes, should it have told the statute of limitations? Should those three items have told the statute of limitations? And there are a number of answers to that. The first answer, and I think it is absolutely dispositive, if I may say so, is there was no evidence. Nobody from SEMPRA testified that those three items, the first one, of course, wasn't in evidence. The Roberts affidavit, the Miller email saying, I have confidence that you'll win, and the Melsheimer affidavit, which has nothing to do with the case. Nobody testified that any of those things lulled them into believing that they did not have to sue Marsh. There is no testimony that anybody relied on it, no testimony that anybody was lulled into it. And so while the lawyers have, I believe, very cleverly tried to find a few pieces of evidence that they call reassurances, there was no evidence at the trial that anybody was actually reassured. And I think that in and of itself is dispositive. Beyond that, and I understand I'm getting close to my time, but beyond that, I do encourage the Court to look at the pieces of evidence that they say were reassurances, were not reassurances at all. An expression of confidence is not a reassurance. An affidavit which tries to help is not a reassurance. All the cases, any of the cases, and there are very few, that SEMPRA points to for lulling that would stop the statute of limitations involve actual reassurances and plaintiffs testified that way. Here's a question I have with respect to California law, a denial letter and so on. Is it your position that a denial letter commences the statute of limitations against the broker even when the insurance company is obviously and patently wrong in the denial? Nonetheless, at that point, the insured or hoped to have been insured should bring a suit against the broker? Well, Your Honor, I have been in – the answer is yes. So even if the insurance company is patently wrong and therefore the broker is patently off the hook, nonetheless, the suit against the broker, the statute starts to run them? I think that has to be the rule because in every case – I didn't ask you whether that has to be the rule. Is that the rule? I'm sorry. I apologize, Your Honor. I believe that is the rule and it ought to be the rule because in litigating these cases, it is almost always the case that the insured says that the insurance company is patently wrong, they're guilty of malpractice, and they ought to pay for it. And of course, the insurer always has another position. Okay. Thank you. All right. Now, you've used up all your time. We'll let the other side go, but we'll make sure you have a chance to respond. Thank you, Your Honor. Judge Tunheim, I can't see you, but I'm assuming that you're still on the phone and able to hear us? I am. I can hear you, yes. Okay, good. Good afternoon. May it please the Court, Kirk Passage and with me, Sandra Smith-Thayer, on behalf of Simpra Energy. The context that we find ourselves in is a bit unusual, but I think we have to consider the context in assessing this entire argument about the statute of limitations. What Mr. Ostlander suggests is rather unique in my mind. He made this point in his opening statement below and he came back to it today. He's basically suggesting that any time an insurance company denies coverage, if you want to pursue your claim against the broker, you need to sue within two years of the denial. No matter whether there's litigation with the insurance company, no matter what stage that litigation is at, no matter how long it takes that litigation to be resolved, you have got to file a lawsuit within two years. There's no public policy in the state of California that supports that notion. In fact, the cases interpreting Code of Civil Procedure Section 339, which is what we're talking about, the California Supreme Court cases say the public policy is to the contrary, that you draw a bright line test so you do not have the client fighting with his advisor, the multiplicity of litigation before you know if there's something wrong. And I think that that goes back to your point, Judge Fletcher, which is it's not every denial letter. In fact, HydroMell itself recognized that because the broker doesn't control when an insurance company denies coverage or what it says, that the denial letter is not the trigger of coverage. Or, I'm sorry, the trigger of the running of the statute. Now, it's a little bit converse there because in HydroMell, the denial letter was being used as a basis to set the statute running earlier than it would have or later than it would have, sort of the converse of what Marsh is arguing here. But HydroMell is the one case that actually talks about this issue. Now, I haven't done the math count, but on my math count, Ms. Roslinder left out some cases like Walker and Williams where the ruling was the statute of limitations didn't bar the claim against the broker. And in those cases, what you're dealing with is the question of you've got to have something else happen. If you look at all of the cases, I'll say 90 percent of the cases in case there's one out there I've missed. If you look at 90 percent of the cases where the broker claim starts running, it is because there's a denial or an issue that is obvious on its face as involved in broker error. The broker's failure to get personal injury coverage in one case. The broker's failure to add two locations that were to be insured under the policy. The broker's failure to get earthquake insurance. The broker's failure to get the right amount of coverage. All of that, or the broker's failure to give notice before the policy period expires. All of those cases, it is evident from the denial itself that the ground being Now, Mr. Oslinder wants to talk about certainty and when a broker must sue. Let's go back to a couple of points here. Number one, National Union denied coverage originally or reserved its rights on nine different grounds. In its statement of defense, it had ten different grounds. None of those grounds were the intangible asset point, which Mr. Oslinder doesn't even mention. We didn't have coverage for intangible assets. That was never mentioned by National Union. It came up in the award for the first time. Currency devaluation. We left a few details out. Actually, Marsh left a few details out. I should be clear on that. Currency devaluation, there's no dispute. SINFRA wasn't trying to buy coverage for currency devaluation as such. That wasn't the structure of this investment. The heart of the investment, all of the testimony is consistent, is the licenses and the tariff protections. SINFRA didn't need coverage against currency devaluation as long as it had the tariffs. It wanted to make sure, and Ms. Melsheimer testified, that she understood the nature of the investment. She understood the risk as it was her duty to do that SINFRA was looking to ensure. That was these tariffs. The question was if the government expropriated the tariffs. By the way, SINFRA won that argument in the arbitration. That was the big argument that everyone was talking about. SINFRA won it. But if the government expropriated the tariffs, then SINFRA could get stuck with currency devaluation. So it wanted protection for the tariffs. That's what Marsh was supposed to ensure. Those were the representations made by Marsh at the time, and they continued for seven years. Not just random statements that were not assurances. Not just somebody drafting something for Heidi Melsheimer to say. It started with the presentation where Marsh left out the currency devaluation exclusion completely. They described it as an insolvency exclusion. It continued... Can you go back and say that one more time? Left what out of what? The presentation that Marsh did, where it outlined the benefits of going to the private market, the flexibility... This is their pitch to you to hire them as the broker? Exactly. And they were saying, here's why you should go with us, and here's what the private market holds. They identified as to national union certain exclusions, the key exclusions. And one of them they listed was insolvency, and that's how they described it. Insolvency for the expropriation coverage, which is what we are talking about here. If you actually go to the policy, it would say insolvency and currency devaluation or fluctuation. So they left out in their initial description to us the currency devaluation when they were summarizing the key exclusions. During the course of the seven years, they never said, you've got a problem with currency devaluation. Now, one of the tricks... This is now Marsh never said. Marsh never said that. In fact... At what point does the insurance company say that? Well, the insurance company cited the currency devaluation as an exclusion that might apply in multiple points, including in the reservation of rights letter well before the arbitration began. And that's one of the problems we have here. Marsh is trying to suggest that there's a bright line where the statute was But when you look at what it argued below in its summary judgment motion, you look at what it said to the jury. Indeed, you look at the brief here. They are citing a whole bunch of different dates, any one of which could be it. Now, they've fallen to the point of saying no later than. We don't know which one of our nine dates it really is, but we do know, stick them all together, it's no later than this date. Not in our context. There's a blurring in the argument today between what happened on summary judgment and what happened at trial. Obviously, if it goes to trial, if there's a tribal issue of fact, it's going to be up for the jury to decide. Well, at the summary judgment, one of the things is, should this court, should the trial court have taken it away from the jury and decided as a matter of law? And the answer to that is no. Jordache, International, the Fedderson case, all these cases recognize, Vucinich, that it's a fact issue generally. And the facts before the trial court at summary judgment, the evidence demonstrated a clear conflict in facts. One of the things that gets kind of skipped over here is that Semper's counsel had a conversation, and this is August of 2005, had a conversation with Marsh's political risk experts, where according to the declaration, and there was no contravening declaration on this point, he says, and I quote, and this is in the SCR at page 377, Mr. Miller, that's the Marsh expert, emphasized his belief that the National Union policy covered Semper's claim. And he goes on to say one other thing. Mr. Miller opined that the currency devaluation exclusion would not apply to Semper's claim. And the reason for that is we're not talking about what happened if the peso was devalued. And now, I'm going to say at the pump, but when the customer in Argentina goes up to buy natural gas, it now costs 10 times more. And therefore, the customer can no longer afford to buy it. That impact of currency devaluation, that no one's seeking protection against. What was to be protected was this pegging of the dollar to the peso in the tariff and the licenses. And that's why Semper wasn't worried about it. That's why we believe Mr. Miller provided the assurance currency devaluation doesn't apply here. Don't worry about that exclusion. Because you are being insured for the tariffs and the licenses, not for the ultimate effects if the tariffs and licenses go. Now, it sounds to me as though you think the arbitration award basis was wrong. Well, I'm not going to argue about the arbitration award because we don't have to. Our damages expert, which was, and there was no controversial evidence on damages. What he demonstrated in his testimony was setting aside the effects of currency devaluation, taking that completely out of the picture. There was damages of more than 48 and a half million dollars. And he talked about things like the balance sheet and debt liability ratios and things like that. So there was testimony in the record below, no contravening testimony whatsoever, that if you adjust for currency devaluation and the effects of currency devaluation, there was still damages and still a loss of above 48 and a half million. And he testified that he capped his number at 48 and a half million because that was the policy limit. And that's all that Semple would be able to cover. Whether I disagree with the arbitration award is immaterial to this proceeding. Let me ask you this. Assuming for the moment that the statute of limitations problem was resolved in your favor, was there any evidence at trial as to how much more the insurance policy that you would hope to get would have cost than the policy that you, in fact, got? No, there was no evidence of any incremental cost differential. The evidence, by the way, on all of this, because I think it's interesting if you go back and you put it in the context, we're told gold standard coverage as broader, broader. That's the representation made. And when you put it in the context of what Mr. Ostlander said to the jury at the start, I think it's a material point when you start with what he told the jury in his many opening statement, because we had miniature opening statements. And then again in his opening statement and again in his closing, because he said, quote, they believed mightily that the claim was covered. He said the evidence also will show that Sempra truly believed that it was covered for its claim. That fits, of course, right in with what the arbitration panel said, because they said that, quote, Sempra believed that such broad coverage is what they received, but they were mistaken. That's what Mr. Lathers said at trial. He thought we had it. He first realized it was a marsh mistake when he read the award. And it wasn't just Mr. Lathers. It was Mr. Smith, the lawyer inside, who testified in deposition. And this was part of the record on summary judgment. He testified as well. Now, that testimony was without a waiver of the privilege by agreement with Marsh's counsel. But the point is this. When Mr. Osslinger stands up here and says, we couldn't tell what else they were thinking. We weren't permitted to get into this. That's not true. They asked the two key witnesses. They dropped the motion to compel on seeking further evidence about stuff that we said was privileged. And they let it go at trial. When I objected to the question on privilege grounds to Mr. Lathers, the judge, Judge Otero, gave them the opportunity to revisit it. They didn't revisit it. And they acknowledged it in the record that they failed to revisit the issue. So the question of privilege, not before this court properly. They had two shots at it. They dropped it both times. It's waived and gone. What we do know, though, in looking at all of this, is we have a series of continuing representations from the get-go, through the conversations with Mr. Miller, through the conversations with the gentleman named Mr. Rosen, all in the Roberts' declaration at summary judgment, through the testimony at trial referencing the email that expressed that confidence you'll win, through Ms. Melsheimer, who simply didn't say, oh, some random exclusion that doesn't apply here. Marsh would love you to believe that her declaration is irrelevant. It is not. She says she thoroughly understood the nature of the risk she was getting insurance for. She testified that if she had thought there was an exclusion that would have applied, she would have brought it to the attention of SEMPRA. She didn't. Even when she sat in meetings with Latham and heard the testimony, and she testified, they were confident, not a word ever, that the currency devaluation exclusion could apply the way the panel said it applied. What we do know is going into that arbitration, there were nine or 10 different reasons that national unions cited as possible grounds for denying coverage. We could have lost on nine of those grounds and it would have had nothing to do with Marsh. We could have lost on expropriation, for example. We knew the policy only covered us if there was expropriation. If the panel decided no expropriation, we're done, not Marsh's fault. What Marsh is suggesting is that we have to do something before it's determined that they may have been a cause of our loss, that they may have been a cause of our issue. And there's no law that says that in this kind of context. I believe that Feddersen is the controlling law. It's under the right statute. We had a remedy just like the service provides. You go through the internal remedy, in our case the arbitration, you find out what the answer is. We do it. Marsh asked the jury to pick which of nine or 10 dates was it. They lost the battle in front of the jury. It was clearly a fact question. Summary judgment was properly denied on that issue. Did the exclusion for intangible interests arise as one of National Union's claims for exclusion? No, actually it was never cited by National Union in its reservation of rights letter or in its statement of defense. It appears to have been gleaned by the panel at some point in argument and showed up in the arbitration award. It was not a subject of the arbitration itself until the tail end when the panel raised it. So this was not an argument. Because as I read the panel award, it says, yes, there was an expropriation. But what was expropriated was an intangible license interest. And therefore, you're out of luck. And then they went on to say, anyway, the devaluation would have excluded you anyway. But it seems to me, if there had been no expropriation of the licenses, you wouldn't have cared about the devaluation. That's absolutely our position. That was the primary ground that the panel went to. It was an issue never raised by National Union. And it went to the heart of our investment, the licenses. We were never warned. No coverage on the licenses. That is my time. So I thank the court. Any further questions from the bench? Hearing none. Thank you. Mr. Aslander. Thank you, Your Honor. Let's start out with giving you two minutes. But you'll get to say what you need to say. Thank you very much. I appreciate that. First, Mr. Passage made reference to, again, to an affidavit by Mr. Roberts in which he quotes his conversation with the broker in London, Mr. Miller. That affidavit was not in evidence. It was specifically excluded in a motion in limine. So I'm not sure what the relevance is here. It's improper. Mr. Passage also just made reference to some deposition testimony by Mr. Roberts. Mr. Roberts did not appear at the trial. He did not testify. It's not in the record for purposes of this appeal. And finally, while the award, the arbitration award is important for purposes of this record, the portions that he just read to the Court are not in evidence either. They were specifically excluded by Judge Otero. Coming back to the reassurances, I invite the Court to read exactly what Mr. Miller said, which they are relying on as reassurances. It does not say anything near what Mr. Passage just described. He said the most he said was, I am confident you'll achieve positive results. It was more of a pat on the back, go get them. The Melsheimer affidavit has absolutely nothing to do with the coverage issues in this case. Finally, as far as whether you have to know there was a broker screw-up is concerned, that is not the law in California. There is no distinction made in the cases about that. And in fact, in the Schutte case in itself, it was a case about a determination of coverage under general liability and pollution liability policies. The insurer sued both the insurer and the broker at the same time, which is not an uncommon thing to do. If Mr. Patches is right, you wouldn't expect to see that all at any time. You might expect to see, well, let's see what happens in the coverage case. But that's not what happens, and that's not what happened in the Schutte case,  Thank you, Your Honor. Thank you very much. Thank both sides for very useful arguments. Semper Energy versus Marsh USA is now submitted for decision, and we're in adjournment. Thank you.
judges: Tunheim, Canby, Fletcher W.